# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| JOSEPH LOZANO, JR., B.L. b/n/f JOSEPH | ) | |
| LOZANO, JR., O.L. b/n/f JOSEPH LOZANO, JR., | ) | |
| and T.L. b/n/f JOSEPH LOZANO, JR., | ) | |
|    Plaintiffs, | ) | |
| | ) | |
|   v. | ) | CAUSE NO.: 2:15-CV-431-PRC |
| | ) | |
| INDIANA DEPARTMENT OF CHILD | ) | |
| SERVICES, STATE OF INDIANA, SHAWNA | ) | |
| M. SMITH, KATHRYN DEARDORFF, RACHEL | ) | |
| GIBSON, TINA DINGMAN, NICOLE | ) | |
| MARKELY, LOUELLA F. RICHEY, | ) | |
| TERRANCE CIBOCH, NATHAN JOHNSON, | ) | |
| and JAMES WIDE, | ) | |
|    Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 38], filed by

Defendants Indiana Department of Child Services, State of Indiana, Shawna M. Smith, Kathryn

Deardorff,[1] Rachel Gibson, Tina Dingman, Nicole Markely, Louella F. Richey, Terrance Ciboch,

Nathan Johnson, and James Wide on July 10, 2017. Plaintiffs Joseph Lozano, Jr., B.L. b/n/f Joseph

Lozano, Jr., O.L. b/n/f Joseph Lozano, Jr., and T.L. b/n/f Joseph Lozano, Jr. filed a response on

October 6, 2017, and Defendants filed a reply on October 20, 2017.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint in the Porter County, Indiana, Superior Court on October 23,

2015. Plaintiffs allege that Defendants violated Plaintiffs' civil rights, bringing claims under 42

U.S.C. § 1983 for the denial of a parent's right to establish a home and raise his children pursuant

---

[1] Although Plaintiffs' Complaint spells Kathryn Deardorff's last name as "Deardoff," all the documentation submitted in the summary judgment briefing, including Deardorff's Affidavit, spells her last name as "Deardorff." The Court will use the correct spelling.

to the Fourteenth Amendment to the United States Constitution; for a violation of Plaintiffs' substantive and procedural due process rights pursuant to the Fourteenth Amendment to the United States Constitution; for a violation of the Plaintiffs' right to be free from unreasonable seizure pursuant to the Fourth Amendment to the United States Constitution; for deprivation of equal protection and due process rights under the Fourteenth Amendment to the United States Constitution by failing to comply with applicable state and federal statutes and regulations; and for deprivation of the right to petition the government pursuant to the First Amendment to the United States Constitution.

In addition, Plaintiffs allege that Defendants violated their statutory duties under Indiana Code § 31-33-1-1, et seq. as well as state and federal statutes and regulations designed to protect families and children, including but not limited to 42 U.S.C. § 5106, 42 U.S.C. § 671(a)(15), 42 U.S.C. § 675(1)(A), 42 U.S.C. § 675(5), and "C.F.R. 1356.21," implemented under Indiana Code ¶ 31-34-1-1. Also under state law, Plaintiffs allege that Defendants failed to use ordinary and reasonable care in connection with their interactions with Plaintiffs.

On November 30, 2015, Defendants removed the case to this Court. The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See*

Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

*1.    Joseph and Elizabeth Lozano's Relationship*

In August 2007, Joseph Lozano, Jr. and Elizabeth met on Facebook. (Joseph Dep. 7:6-17.) On the second night that they were dating, Elizabeth moved in with Joseph into his parents' house, where Joseph's parents, three nephews, and sister lived. (Joseph Dep. 7:20-25, 8:23-9:13.)

Joseph and Elizabeth had three children together. O.L. was born was born in 2008. (Joseph Dep. 8:12-15). Joseph and Elizabeth married the next month. (Joseph Dep. 8:6-11). In September 2008, Joseph and Elizabeth moved into their mobile home. (Joseph Dep. 10:17-23). In 2009, B.L. was born. (Joseph Dep. 13:22-23). In late 2009, Joseph, Elizabeth, O.L., and B.L. moved back into Joseph's parents' house. (Joseph Dep. 14:11-16). In 2011, T.L. was born. (Joseph Dep. 16:11-12).

On March 13, 2012, a report was made to DCS that Elizabeth took the children to Wisconsin and did not return. (Ex. Z). On May 10, 2012, a report was made to DCS concerning O.L. living with her grandfather and a previous unsubstantiated report of sexual abuse in Wisconsin. (Ex. AA).

In January 2013, Joseph, Elizabeth, and the children stayed in an EconoLodge. (Ex. V - DCS000009). On January 21, 2013, a report was made to DCS that Elizabeth drinks and takes drugs, that Joseph takes drugs, and that the children were left unattended. (Ex. BB). While living at the EconoLodge, Joseph and Elizabeth were investigated by DCS for neglect. (Ex. V - DCS000009-11). Among other things, the report source claimed that Joseph used the drug "triple c." (Ex. V - DCS000009; Ex. BB - DCS000044). The allegations of neglect were unsubstantiated, although Joseph tested positive for THC. (Ex. V - DCS000010; Joseph Dep. 78-79: 24-5).

Joseph was incarcerated from April 2013 to August 2013. (Joseph Dep. 17:6-12). Before Joseph went to jail, Joseph's mother, Paula Lozano, had not made any reports to the Indiana Department of Child Services ("DCS") about the children. (Paula Dep. 13:5-13). While Joseph was incarcerated, Elizabeth obtained government-assisted housing in Valparaiso. (Joseph Dep. 16:23-17:5, 21:16-17, 22:4-12). On August 8, 2013, Joseph was released from jail and moved into the apartment with Elizabeth. (Joseph Dep.23:17-24:1). Joseph never saw Elizabeth abuse the children. (Joseph Dep. 29:17-24). When living with Elizabeth after getting out of jail, Joseph never

saw Elizabeth abuse the children in any way. (Joseph Dep. 85:9-15). Joseph never notified DCS that Elizabeth was abusing the children. (Joseph Dep. 85:13-15). Joseph testified that, in mid-September, Elizabeth "kicked [him] out" of the apartment. (Joseph Dep. 24:2-6).

Shortly after, Elizabeth obtained Orders of Protection for herself against Joseph, each of his parents, and Crystal. (Joseph Dep. 27:12-16, 27:21-25; Paula Dep. 29:12-13, 30:6-19, 48:2-14; Ex. G-J).[2] The Order of Protection against Joseph lists O.L., B.L., and T.L. as "Protected Persons." (Ex. G).

After Elizabeth made Joseph leave the apartment, Paula called the DCS hotline many times. (Paula Dep. 25:4-11). Joseph never saw Elizabeth abuse the children. (Joseph Dep. 29:17-24). As far as Joseph knows, DCS investigated the allegations. (Joseph Dep. 89:5-12).

*3.*     *Valparaiso Police Department Investigates Paula's Accusations of Abuse*

On September 25, 2013, Paula met with Officer Pederson of the Valparaiso Police Department and made a complaint regarding suspected child abuse by Elizabeth. (Paula Dep. 31:14-15, 32:6-21; Ex. S - DCS000279). The same date, Officer Pederson conducted a wellness check, but did not see any signs of bruising and reported that the children looked okay. (Joseph Dep. 89:9-18; Paula Dep. 33:1-9; Ex. W - DCS 000014; Ex. S - DCS000280).

*4.*     *FCM Shawna Smith Investigates Reports Made to DCS*

Also on September 25, 2013, DCS received a report alleging O.L. was the victim of physical abuse, including bruises on her face and arm; that T.L. had a diaper rash and a bruise on his leg; that Elizabeth's apartment was a mess; and that Elizabeth had gotten a restraining order "on all of them."

---

[2] The term "protective order," "no-contact order," and "restraining order" were used interchangeably by many of the individuals involved in this case, although it is the same document being referenced each time. The box for "protective" order was checked on the document itself. *See* Ex. G. The parties have agreed to refer to this document as an "Order of Protection."

(Smith Aff. ¶¶ 4-5, Ex. W - DCS 000013; Ex. CC - DCS000047-48). On September 26, 2013, Family Case Manager ("FCM") Shawna Smith met with O.L. at O.L.'s elementary school. (Smith Aff. ¶¶ 4-5; Ex. W - DCS 000014). O.L. appeared healthy and was appropriately dressed. *Id*. O.L. stated that both parents spanked her on her butt when she got in trouble. *Id*. O.L. denied being scared of Elizabeth or having been harmed by Elizabeth in any way. *Id*. O.L. had a "very small circular mark" on the right side of her face. *Id*. O.L. denied anyone hitting her. *Id*. O.L. stated that Elizabeth cleaned O.L.'s room every day. *Id*.

On September 27, 2013, FCM Smith made a scheduled home visit to Elizabeth's apartment. (Smith Aff. ¶¶ 4-5; Ex. W - DCS 000014). There was not any alcohol in the apartment, and Elizabeth did not appear to be under the influence. *Id*. Smith was told that Elizabeth was not allowed to drink under the terms of her probation. *Id*. Smith found the home very neat and tidy, well above the minimum sufficient level of care, and there was nothing endangering to the health and safety of the children. *Id*. Smith noted that there were ample amounts of food and supplies and that all household utilities appeared to be in safe operating condition. *Id*.

B.L. appeared healthy, was appropriately dressed, and did not have any bruises or obvious signs of injuries at the time of the interview. *Id*. B.L. stated that when he was punished he was put in "time out" or is spanked. *Id*. Smith asked B.L. if he ever got hurt after being spanked, to which B.L. said no. *Id*. B.L. denied that his brother or sister had been hurt after being spanked. *Id*. B.L. denied being scared of his mother or anyone who comes to visit the home. *Id*.

Smith was unable to interview T.L. due to his age. (Smith Aff. ¶ ¶¶ 4-5; Ex. W - DCS 000014). However, T.L. appeared healthy and appropriately dressed and did not have any injuries or obvious signs of injury. *Id*. Smith reached the following conclusions:

> Physical abuse (bruises/cuts/welts) against Elizabeth Lozano in regards to O.L. will be unsubstantiated as there is a lack of a preponderance of evidence to support the allegations are true. O.L. did not have any injuries and denied being physically abused by her mother. The children all report receiving age appropriate discipline and deny a history of receiving injuries as a result of physical discipline. FCM found nothing in the home to be endangering to the health and safety of the children.

(Smith Aff. ¶¶ 4-5; Ex. W - DCS 000015).

On September 28, 2013, DCS received a report that Elizabeth drinks, takes pills, and is violent and that the children were left alone but not overnight. (Ex. DD).

On October 3, 2013, FCM Smith met with Joseph at the DCS office. (Smith Aff. ¶¶ 4-5; Ex. W - DCS 000014). According to Smith, she advised Joseph of the allegations, the reasons for the current DCS assessment, and the outcome of that assessment; Joseph denied any concern for the safety of his children when describing his observations of the home; Joseph denied that Elizabeth's alcohol consumption has ever endangered the safety of the children; Joseph also denied any knowledge of Elizabeth currently drinking; and Joseph was advised that if he had any future concerns for his children he could contact DCS or contact law enforcement to request a wellness check of the children. *Id*. In his deposition, Joseph testified that Smith told him, "Stop having your friends and family call about child abuse." (Joseph Dep., 88:25-89:4).

*5.    FCM Deardorff Investigates Reports Made to DCS*

On October 8, 2013 DCS received a report that Elizabeth was leaving the children by themselves and locking them in the apartment; that Elizabeth abused the children in the past, with T.L. having welts on his legs and B.L. having a black eye, and that these incidents were reported to DCS; that Elizabeth is an alcoholic; and that Elizabeth was using drugs and was mentally abusing the children by keeping the children away from their family. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000017-18).

On October 10, 2013, FCM Deardorff made an unannounced visit to Elizabeth's home. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000018). Deardorff observed that Elizabeth did not appear to be under the influence of anything and that there did not appear to be any alcohol containers in the home. *Id*. Elizabeth admitted that she did have a drinking problem but that she had been sober since April 2013 because she made the decision that her children were more important. *Id*. Elizabeth also denied using any type of non-prescribed pills and reported that she was no longer taking Xanax. *Id*. Elizabeth adamantly denied that she left the children unattended, stating that the only time the children are left alone is for 1-2 minutes when she might walk over to the neighbor's house to borrow something. *Id*. Elizabeth also had a probation officer and was attending two classes a week for Housing Opportunities in order to keep her family in their home. *Id*. Elizabeth stated that on October 31, 2013, she and her children would be moving into the Caring Place, at the recommendation of her Housing Opportunities worker. *Id*.

On October 15, 2013, FCM Deardorff conducted an announced home visit. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000018). Present was Elizabeth, O.L, B.L., T.L., and Ann Baas, Elizabeth's caseworker from the Family Youth Service Bureau. *Id*. Deardorff noted that B.L. had a scrape on the top right side of his forehead and a small bruise on the outside of his right ear. *Id*. Elizabeth stated that B.L. had recently thrown himself down on the concrete and had also been hitting himself when he becomes angry. *Id*. Baas informed Deardorff that there were issues regarding B.L.'s behavior and that Baas was making a referral for B.L. to see a therapist to see if something was going on emotionally. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000019). Deardorff asked O.L. what happened to B.L., and O.L. stated that B.L. "hits himself." *Id*. Deardorff noted that B.L. had a t-shirt

on and his arms appeared free from any cuts, marks, welts, or bruises. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000018).

O.L. stated that when she gets into trouble she has to stand in the corner like her brother. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000019). O.L. denied that she or her brothers got spanked, that physical abuse occurred in the home, and that the children were ever left alone. *Id*. O.L. appeared free from any cuts, marks, welts, or bruises. *Id*. O.L. stated that the neighbor "Ms. Angela" would watch the children if Elizabeth had to go somewhere but that the children are primarily watched by Elizabeth. *Id*.

On October 17, 2013, DCS received a report that Elizabeth and the neighbor "Angela" bully the children and that B.L. had bruises and red marks on his face that were not there the other day. (Ex. GG).

*6.      B.L. Is Admitted to the Hospital*

On October 23, 2013, FCM Williams met with Elizabeth, B.L., and T.L. (O.L. was at school) at the Lake County Juvenile Courthouse. Elizabeth reported that, on the previous day, B.L. had thrown himself down the stairs and exhibited self-harming behavior. An attempt was made to interview B.L., but due to his lethargic state he could not remain focused. Because of the concern of possible head trauma, B.L. was taken to Methodist Hospital in Merrillville, Indiana. (Ex. X - DCS000019).

The same date, FCM Deardorff received a phone call from Family Case Management Supervisor ("FCMS") LaShaunta Pierce. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000019). Deardorff was informed that due to possible head trauma, B.L. had been taken to the hospital. *Id*. FCM Deardorff and FCM Smith went to the hospital. *Id*. Smith contacted Detective Castellanos of the

Valparaiso Detective Bureau, who met Deardorff and Smith at the hospital. *Id*. Deardorff and Smith

escorted Elizabeth to a small private room. *Id*. Elizabeth's neighbor Angela Terrell joined them.

Elizabeth told them that on October 22, 2013, B.L. had fallen down the stairs. Elizabeth and Angela

provided extensive details regarding B.L. behavior.

Deardorff and Smith then visited B.L. in the emergency room. B.L.'s right ear was purple

and he had a black eye. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000020). B.L. had two large injuries on

each side of his bottom, and his arms were covered in bruises and appeared to have four cigarette

burns. *Id*. B.L.'s speech was slurred and much slower, and his body movements were much slower.

*Id*. Deardorff and Smith attempted to speak to B.L. about his injuries, but he gave varying stories

and was falling asleep throughout the conversation. *Id*. T.L. did not have any outward signs of abuse

or neglect. Deardorff and Smith contacted Detective Castellanos who took pictures of B.L. Detective

Castellanos, FCM Williams, and B.L.'s attending nurse all attempted to speak with B.L. but were

unable to get an answer about how he was injured.

At that time, it was determined that all three Lozano children would be taken into protective

custody. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000021). FCM Smith contacted FCM Gibson of Porter

County DCS who in turned picked O.L. up from school. A "Taking Custody of A Child Without a

Verbal or Written Court Order: Description of Circumstances" form was completed by Deardorff

for both Elizabeth and Joseph, and the forms were submitted to the juvenile court at the Initial

Detention Hearing. (Deardorff Aff. ¶ 9, Exs. SS, RR - DCS000129-132). Deardorff also filed a

"Petition for Emergency Detention" for each of the children. (Ex. K - DCS000126-128). The three

children were placed with a foster family.

That same day, October 23, 2013, Deardorff, Detective Castellanos, and Elizabeth went to the Valparaiso Police Department in Detective Castellanos' car. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000021). Elizabeth admitted to Deardorff that, although she initially told DCS that she took B.L. to the hospital on October 22, 2013, she had lied and that she did not take B.L. to get examined. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000023-24). Throughout the interview and subsequent investigation, it was discovered that B.L. had been abused. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000023-29). The majority of the abuse was attributable to Elizabeth's neighbor, Angela Terrell. *Id.*

Joseph was not aware that Angela Terrell was involved until the discovery from the police. (Joseph Dep. 85:23-86:-1). Paula never mentioned Angela Terrell to DCS because she did not know about her. (Paula Dep. 66:2-15). Paula did not report to DCS any abuse with a wooden spoon, a flyswatter, a belt, or that B.L. was slapped. (Paula Dep. 64:2-19). Paula also did not report that B.L. had been punished by having food withheld or that B.L. was once punished for urinating on Terrell's floor. (Paula Dep. 64-65:20-7).

*7.    The October 24, 2013 Initial Detention Hearing*

On October 24, 2013, a Verified Petition Alleging Children in Need of Services was filed by DCS attorney Julie Carter. (Ex. L - DCS000145-147). The Petition included that "[t]he father of the children does not have legal custody and the Porter Superior Court issued an Order of Protection on September 26, 2013, which prohibits him from having contact with the children due to issues of domestic violence. The Order is in effect until September 24, 2015." (Ex. L - DCS000146).

On October 24, 2013, Joseph had a court date with the Porter Superior Court to get the September 24, 2013 Order of Protection dismissed. (Joseph Dep. 33:3-13). Joseph and Paula were

en route to the court hearing when Joseph received a call informing him that he was needed at the Porter Juvenile Court. (Joseph Dep. 35-36:16-8). They changed direction, and Paula drove Joseph to the juvenile court. (Paula Dep. 36:2-7).

At the Porter Juvenile Court, present were Joseph, Joseph's attorney Donald J. Evans, Elizabeth, Elizabeth's attorney Joanne Baitup, DCS attorney Julie Carter, and FCM Deardorff. (Joseph Dep. 37:5-11; Ex. M - DCS000149-150). The Porter Juvenile Court issued a "Detention/Initial Hearing Order" that same day, October 24, 2013. (Ex. M - DCS000149-151). The court found that it was in the children's best interest to be removed from the home and that "reasonable efforts to prevent or eliminate removal of the children were not required due to the emergency nature of the situation." (Ex. M - DCS000150). Further, the Court stated, "The Court finds there is currently a protective order in place between father and the children, and that there is the potential for a No Contact Order between mother and the children, and therefore does not authorize mother or father visitation with the children at this time." (Ex. M - DCS000150). The Court also issued an "Order for Emergency Detention," ordering that the three children should be immediately detained by DCS. (Ex. N - DCS000152). Lastly, to allow Joseph and Elizabeth the opportunity to consult with counsel, the court set a Continued Initial Hearing for November 5, 2013. (Ex. M - DCS000151).

While the October 24, 2013 juvenile court hearing was occurring, FCM Smith met B.L. and his foster parents at the St. Anthony Hospital in the Emergency Room. (Ex. X - DCS000029). The foster father stated that B.L. had slept most of the time in their care and that he complained of head pain. *Id*. The CT scan of B.L.'s brain showed a subdural hematoma, and B.L. was transported to Riley Children's Hospital in Indianapolis. *Id*.

During the October 24, 2013 hearing, the Porter Juvenile Court judge notified Joseph that B.L. was seriously injured, that B.L. was being taken to Riley's Children's Hospital in Indianapolis, and that the other two children had been put in foster care. (Joseph Dep. 38:1-16, 40:15-19). After the hearing, FCM Deardorff met with Joseph and advised him of the report made regarding his children on October 11, 2013. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000030).

While Joseph and his mother were in the juvenile court hearing, Joseph's father went to the Porter Superior Court regarding the September 24, 2013 Orders of Protection against Joseph, his parents, and his sister. (Joseph Dep. 36:12-18; Paula Dep. 36:2-7). The four Orders of Protection were dismissed the same day as the juvenile court hearing. (Joseph Dep. 56:18-23, 86:19-10; Paula Dep. 36:18-20). Although it is unclear at what time the Orders of Protection were dismissed, it is clear that the Porter Juvenile Court judge did not know that the Order of Protection against Joseph had been dismissed at the time of the judge's ruling. (Paula Dep. 36:16-25, 40:17-25, 47:2-10). The juvenile court did not receive the paperwork that showed that the Order of Protection against Joseph had been dismissed until October 28, 2017. (Paula Dep. 50-51:20-7).

On October 24, 2013, DCS received reports that Riley Children's Hospital was attempting to get in contact with Porter County DCS and that permission was needed to treat B.L. (Exs. II, JJ). On October 25, 2013, DCS again received a report that Riley Children's Hospital needed permission to treat B.L. (Ex. JJ).

At all relevant times, including from October 24, 2013, through December 5, 2013, Joseph and Elizabeth were married and were not deemed legally separated, as Joseph's Verified Petition for Dissolution was not filed until July 2014 and the Decree of Dissolution of Marriage was not entered until May 8, 2015. (Pl. Ex. 27).

8.      *Markley Informs Joseph of B.L.'s Condition*

On October 25, 2013, B.L. had brain surgery at Riley Children's Hospital during which a bone flap was removed in order to relieve the pressure on B.L.'s brain. (Deardorff Aff. ¶¶ 4-5; Ex. X - DCS000030; Markley Aff. ¶ 9). B.L. was kept at Riley Children's Hospital from October 24, 2013, until November 11, 2013. Id.

Over the weekend of October 24-25, 2013, FCM Nicole Markley was contacted by the social worker from Riley Children's Hospital, who gave Markley updates. (Markley Aff. ¶ 5). On October 25, 2013, Markley called Joseph and relayed the information about B.L.'s condition. (Markley Aff. ¶ 6). Markley told Joseph that she would let him know when she got any more information. *Id*. Joseph was upset and did not understand why he could not visit B.L. at Riley Children's Hospital. *Id*. Markley told Joseph that, while the Order of Protection was in effect, there was nothing she could do about it and that she was required to follow court orders. *Id*.

On October 26, 2013, DCS received four reports regarding the Lozano children. The first report was that the reporting source was looking for information on B.L.'s condition on the basis that Joseph was not being given information despite being promised frequent communication. (Ex. KK). A second report made complaints against Elizabeth and complained that Joseph was not being given information. (Ex. LL). The third report was that past complaints of abuse had not be investigated and that the paternal family was being kept from the children. The report also informed DCS that the Order of Protection was dismissed. (Ex. MM). The fourth report was the same as the third. (Ex. NN).

On October 28, 2013, at 8:15 a.m., Markley called Joseph, but she received a notification that Joseph's voicemail was full. (Markley Aff. ¶ 7). On October 28, 2013, at 4:00 p.m., Markley

attempted to call Joseph from her cell phone, but she received a notification that his phone would not accept voicemails from blocked calls. (Markley Aff. ¶ 8). On October 29, 2013, Markley spoke to Joseph at 7:15 a.m. (Markley Aff. ¶ 9). Joseph stated that he had been having problems with his phone. *Id*. Markley gave Joseph a rather long update of B.L.'s condition, including B.L. having a piece of his skull removed to lower the pressure on his brain and that B.L. was on a breathing tube and heavily sedated at that time. *Id*. Markley told Joseph that she would let him know if there were any updates and that she would be in contact when the hospital wanted to replace the skull piece because that would require consent. *Id*.

On November 5, 2013, Markley notified Riley Children's Hospital that Joseph had been granted visitation rights by the Porter Juvenile Court. (Markley Aff. ¶ 12). At that point, Riley Children's Hospital gave Joseph a call-in code that allowed Joseph to call and receive information about B.L. *Id*.

9.      *Joseph Goes to Indianapolis DCS Headquarters and Speaks to James Wide*

At some point, Joseph and his mother drove to DCS headquarters in Indianapolis. (Joseph Dep. 44:4-14; Paula Dep. 43:17-21). Joseph spoke with James Wide, who is the Deputy Director of Communications for DCS. (Joseph Dep. 44:15-21, 47:10-11; Paula Dep. 43:17-21; Ex. F - Wide Aff. ¶ 2). Paula testified that James told her and Joseph that he would try to help them so that Joseph could visit B.L. and the children would go to Paula's home. (Paula Dep. 44:10-23, 45:8-12). Joseph expected James to give him a reason and explain more of the situation why the children were not in Joseph's custody. (Joseph Dep. 49:7-11). Wide did not know anything about Joseph's situation before he spoke to Joseph. (Joseph Dep. 49:12-16). As Deputy Director of Communications, Wide has no role or involvement in the detention, retention, or placement of children. (Wide Aff. ¶ 12).

Wide was not involved in any decision regarding Paula, Joseph, or any of the three children. (Wide Aff. ¶ 13).

10.    *November 5, 2013 Continued Initial Hearing*

On November 5, 2013, the Continued Initial Hearing was held, at which Joseph appeared with appointed counsel. (Ex. P - DCS000155-158). The Court ordered that Joseph "shall have supervised visitation with the children. If the hospital requests that the visitation with B.L. be terminated they may do so at that time." (Ex. P - DCS000157, ¶ 14). The Court also ordered that "[t]he children are currently in foster care and shall remain in said placement; DCS is given responsibility for placement and care of the children." (Ex. P - DCS000157, ¶ 13).

11.    *November 7, 2013 Family Team Meeting*

On November 7, 2013, Joseph had a "Family Team Meeting" with DCS after the children were placed in foster case, which included Nicole Markley and Tina Dingman. (Joseph Dep. 64:13-20; Markley Aff. ¶¶ 14-15, Ex. OO - DCS000114-119). Dingman felt that the meeting was positive. (Dingman Aff. ¶ 7). Everyone seemed to be "on the same page and happy with the way the case was proceeding." *Id*. At the meeting, a plan was established. (Markley Aff. ¶¶ 14-15, DCS000114-119).

12.    *Joseph's Visitation with the Children*

In the Detention/Initial Hearing Order, the Court did not authorize any visitation time between Joseph and the children. (Paula Dep. 40:17-25; Ex. M - DCS000150). Paula understood that, even though the Order of Protection was dismissed the same day by a different court, DCS was still prevented from allowing Joseph to see the children because of the Detention/Initial Hearing Order. *Id*.

On November 12, 2013, the Porter Juvenile Court filed its "Continued Initial Hearing Order," which was based on the Magistrate's November 5, 2013 recommendation. (Ex. P - DCS000155-158). In its order, the Porter Juvenile Court allowed Joseph to have supervised visits with the children. (Ex. P - DCS000155-158; Joseph Dep. 52:9-17; Markley Aff. ¶ 12). Joseph was allowed supervised visits with O.L. and T.L. twice a week for two hours through KidsPeace. (Joseph Dep. 52:18-53:-4). KidsPeace is a mutual place for meeting with the foster parents. (Joseph Dep. 55:2-4). Parent-child visits are almost always supervised in the beginning if the parent has not seen the child in a while, or if there are safety concerns. (Dingman Aff. ¶ 10). In those situations, DCS wants a neutral third party to provide feedback on the interaction between the parent and the child. *Id*. After repeatedly asking to visit B.L. in the hospital, Joseph was allowed an hour of supervised visitation, two days before B.L. was released from the hospital. (Joseph Dep. 53-54). Once B.L. was released from the hospital, he was placed in foster care with O.L. and T.L. (Joseph Dep. 54:14-15). Joseph saw B.L. at two of the visits at KidsPeace. (Joseph Dep. 54:17-24).

13.    *Events Leading to Reunification*

After B.L. was in the hospital, Joseph was still living at his parents' house. (Joseph Dep. 59:3-6). When someone brings an issue about the non-offending parent to the attention of DCS, DCS must still look into that issue. (Dingman Aff. ¶ 8); (Markley Aff. ¶ 16). If there is any type of allegation of drug use, domestic issues, or anything that could jeopardize the safety of a child, the FCM must look into that allegation—even if the allegation is made against the non-offending parent. (Dingman Aff. ¶ 8); (Markley Aff. ¶ 16). In this case, there were allegations that Joseph had a history of drug use. (Dingman Aff. ¶ 9). Specifically, Joseph had previously tested positive for THC.

(Joseph Dep. 78-79:24-1). Even though he was the non-offending parent in this situation, DCS still had to look into that allegation. (Dingman Aff. ¶ 9).

That is why Joseph was required to take drug screens. *Id*. When the child visitation started, DCS wanted Joseph to pass drug screens. (Joseph Dep. 63-64:22-4). Joseph testified that, if someone had previously tested positive for THC, Joseph would want them to be drug screened. (Joseph Dep. 66:13-20). Joseph thought it was reasonable that DCS would want him to submit to a drug screen before DCS placed the children back with him. (Joseph Dep. 67:3-8).

Joseph testified that he would not want DCS to place his children in a household where someone had been disqualified on the basis of a background check. (Joseph Dep. 68:23-69:4, 72:1-3). Before the children were placed with Joseph, Joseph was living at his parent's house, and his parents did not pass their background checks. (Joseph Dep. 72:24-25, 73:8-14). When something is brought to the attention of DCS about the people that the parent is living with, DCS must look into that issue. (Markley Aff. ¶ 17). In this case, there had been an Order of Protection granted against Joseph's parents. (Markley Aff. ¶ 17). As a result, Markley did a background check on Joseph's mother Paula and Joseph's father Joseph, Sr. (Markley Aff. ¶ 17). Joseph testified that he thinks it is reasonable that DCS would want to verify that everyone in the household could pass a background check. (Joseph Dep. 67:15-18, 67-68:1-3).

Joseph's father's background screen came back as "disqualified" on November 8, 2013. (Joseph Dep. 68:11-19, 69:5-10; Ex. VV - DCS000178-179). Joseph's father requested a waiver on November 21, 2013. (Ex. WW -DCS000190). Joseph testified at his deposition that he would not want DCS to place the children with someone who did not pass a background check, including his father. (Joseph Dep. 72:1-13). Joseph's mother's finger-print based criminal history status was

"disqualified." (Joseph Dep. 73:4-7; Paula Dep. 54-55:9-6; Ex. ZZ - DCS000206-208). Joseph's mother requested a waiver on November 21, 2013. (Joseph Dep. 73-74:21-1; Paula Dep. 57-58:17-11; Ex. AAA - DCS000221). On November 25, 2013, FCM Markley requested a waiver for both of Joseph's parents. (Ex. AAA - DCS000220; Markley Aff. ¶ 21). Markley supported the waiver because the prior charges against them did not involve children, and the charges occurred before either of them had children. *Id*. Markley's supervisor, FCMS Tina Dingman, reviewed and approved the waiver. *Id*.

On November 20, 2013, FCM Markley did a home inspection of Paula's home, where Joseph was living. (Markley Aff. ¶ 18). The house was small, but it was appropriate and there were no concerns with the home. *Id*. On Tuesday, December 3, 2013, FCM Markley received notification that a waiver was unnecessary. (Markley Aff. ¶ 22). After considering all of the evidence, including the protective orders, the drug tests, the background checks, and the living situation, Markley decided that the children could be placed back with their father and be in a safe environment. *Id*.

On December 5, 2013, a DCS attorney filed for a change in placement to have the children placed with Joseph. (Ex. Q - DCS000160). On December 5, 2013, the Porter Juvenile Court approved the change in placement. (Ex. Q - DCS000160; Markley Aff. ¶ 24). The children were placed with Joseph on December 6, 2013. (Joseph Dep. 55:17-13, 74:2-4; Markley Aff. ¶ 25). On January 27, 2014, the CHINS petition was dismissed. (Ex. R - DCS000167-169). In a January 8, 2014 letter, DCS notified Joseph that "the reasons for our involvement no longer pose a risk to the children and that safety measures have been put in place to ensure the children remain safe in your care." (Ex. PP - DCS000122). On February 4, 2014, DCS filed a Motion for Change of Custody,

requesting that the Porter Juvenile Court "change custody from joint legal and physical custody to legal and physical custody with the father, Joseph Lozano." (Pl. Ex. 9).

14.    *Defendant Louella F. Richey*

Louella F. Richey is the DCS Local Office Director for Porter County. (Richey Aff. ¶ 3). Joseph does not know who Louella Richey is and does not know what involvement she had in the case. (Joseph Dep. 89:19-22). Richey's only interaction with the Lozano family was a single phone call related to Joseph wanting to visit B.L. in the hospital. (Richey Aff. ¶ 7). At that time, Richey told Joseph that there was an Order of Protection in place and that she could not defy a court order. *Id*.

15.    *Defendants Rachel Gibson, Terrace Ciboch, and Nathan Johnson*

Rachel Gibson works for DCS. (Joseph Dep. 87:18-21). Joseph does not remember how Rachel was involved in this case. (Joseph Dep. 87:22-88:4). Joseph does not know who Terrance Ciboch is and did not talk to Ciboch. (Joseph Dep. 89-90:23-1, 90:2-5). Joseph does not know who Nathan Johnson is and never talked to Johnson. (Joseph Dep. 90:6-9).

## ANALYSIS

Defendants seek summary judgment on all of Plaintiffs' claims. In response, Plaintiffs pursue only certain of their federal constitutional claims, abandoning the remaining claims. The Court considers each claim in turn.

### A. Federal Claims – 42 U.S.C. § 1983

Plaintiffs bring their federal constitutional claims against Defendants under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. In the Complaint, Plaintiffs allege violations of their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as certain federal statutes. Defendants seek summary judgment in their favor on all of the § 1983 claims.

*1.    Claims Against Defendants State of Indiana and Indiana Department of Child Services*

Defendants State of Indiana and Indiana Department of Child Services seek summary judgment on the § 1983 claims on the basis that they are not "persons" within the meaning of § 1983. Plaintiffs do not respond to this argument, abandoning their § 1983 claims against these Defendants. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003). The United States Supreme Court has held that neither a State nor its officials acting in their official capacities is a "person" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). This prohibition includes claims against state agencies. *Ryan v. Ill. Dep't of Children and Family Servs.*, 185 F.3d 751, 758 (7th Cir. 1999); *see also East v. Lake Cnty. Sheriff Dep't*, No. 2:14-CV-58, 2015 WL 5286920, at *5 (N.D. Ind. Sept. 9, 2015) (recognizing that DCS is a branch of the State of Indiana and, thus, is not a "person" for purposes of § 1983). Thus, Defendants State of Indiana and Indiana Department of Child Services are entitled to immunity under the Eleventh Amendment to the United States Constitution for Plaintiffs' § 1983 claims for money damages, and the Court grants summary judgment in their favor on those claims.

*2.      Claims Against Defendants Gibson, Ciboch, Johnson, Wide, and Richey*

Claims brought under 42 U.S.C. § 1983 require a showing of personal involvement in the alleged constitutional violation. *Palmer*, 327 F.3d at 594. Defendants Rachel Gibson, Terrance Ciboch, and Nathan Johnson seek summary judgment in their favor on the § 1983 claims on the basis that Plaintiffs have not shown that these individuals were involved in any of the claims. Plaintiff Joseph Lozano, Jr. testified that he does not remember how Gibson was involved in the case, that he does not know who Ciboch is but knows that he did not speak with him, and that he does not know who Johnson is but knows that he did not speak with him.

Defendant James Wide, the Deputy Director of Communication for DCS, seeks summary judgment in his favor because he had no role or involvement in the detention, retention, or placement of the Lozano children and had no involvement in any decision regarding Paula Lozano, Joseph Lozano, Jr., or Joseph's three children.

Similarly, Louella F. Richey, the DCS Local Office Director for Porter County, seeks summary judgment in her favor because Plaintiffs have not shown that she had any involvement, other than in a supervisory role, which, by itself, is not a basis for § 1983 liability. *See Palmer*, 327 F.3d at 594. Richey's only direct interaction with the Lozano family was a phone call to DCS by Joseph, who wanted to visit B.L. at Riley Children's Hospital. Richey told Joseph that there was an Order of Protection in place and that she could not defy a court order.

Plaintiffs do not provide a response in support of their claims against any of these Defendants. Thus, Plaintiffs have waived any argument and abandoned these claims. *Palmer*, 327 F.3d at 597-98. Finding that Plaintiff has not identified any personal involvement of these defendants that would support a constitutional violation, the Court grants summary judgment in

favor of Defendants Rachel Gibson, Terrance Ciboch, Nathan Johnson, James Wide, and Louella F. Richey on all of Plaintiffs' § 1983 claims.

3. *Constitutional Claims Against Defendants Smith, Deardorff, Markley, and Dingman*

    a.     Fourth Amendment right to be free from unreasonable seizure

In their Complaint, Plaintiffs allege a violation of their Fourth Amendment right to be free from unreasonable seizure. (Cmplt. ¶ 16.c). As an initial matter, this claim, if otherwise supported by evidence, can only proceed against Defendants Kathryn Deardorff and Shawna M. Smith, because they were involved in the decision to detain the children on October 23, 2013; the remaining individual Defendants Markley and Dingman were not. In addition, the claim can only be brought by the Plaintiff children and not by Plaintiff Joseph Lozano, Jr. because Joseph was not seized; his claim is properly analyzed under Fourteenth Amendment substantive due process, which is addressed below. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 480 (7th Cir. 2011); *see also Coley v. Abell*, 682 F. App'x. 476, 478 (7th Cir. 2017).

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment applies to DCS employees who perform searches and seizures in connection with their investigations. *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003). A person is "seized" for purposes of the Fourth Amendment "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In this case, the Lozano children were placed in foster care; the parties do not dispute that there was a seizure.

But seizure alone is not a Fourth Amendment violation; the seizure must also be unreasonable. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000) (quoting *Donovan v. City of Milwaukee*, 17 F.3d 944, 949 (7th Cir. 1994)). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each particular case." *Id.* (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, *or* if it is justified by exigent circumstances, meaning that the state officers have reason to believe that life or limb is in immediate jeopardy." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999)); *see also Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012) (quoting *Hernandez*, 657 F.3d at 474). The probable cause analysis is an objective one. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011). The case managers' "subjective beliefs are largely irrelevant to the probable cause inquiry." *Id.* The court's "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Id.*

In the motion for summary judgment, Defendants argue that there was probable cause to remove the children from Elizabeth's custody based on the circumstances of the physical injuries suffered by B.L. However, Defendants do not argue that there was probable cause to keep the children from *Joseph*. In response, Plaintiffs argue that the Lozano children's constitutional rights were violated on October 23, 2013, when FCM Deardorff seized them from their father, Joseph,

against whom there had never been any allegation of abuse and who did not pose an immediate threat. Plaintiffs do not contest the seizure of the children from Elizabeth, noting that the available evidence was that Elizabeth had abused them.

In their reply, Defendants argue, without citation to law, that the Lozano children were not seized from Joseph because the children were not living with him, because he had not had contact with them due to the practical consequences of the Order of Protection that prohibited him from contacting Elizabeth, and because he believed that he was prevented from having contact with them. However, as discussed in more detail below, the Order of Protection did not in fact prevent Joseph from having contact with the children, and there is no evidence or argument before this Court that Joseph was not a custodial parent. The February 4, 2014 DCS Motion for Change of Custody indicates that Elizabeth and Joseph had joint legal and physical custody. Joseph and Elizabeth were still married, and there was no marriage dissolution proceeding in place at the time. Nor does the fact that Joseph could not contact Elizabeth pursuant to the Order of Protection, which, as a practical matter, meant that he was effectively prohibited from being with the children most of the time, change the possibility that he was still a custodial parent whose right to contact his children had not been revoked. Defendants cite no case law under these circumstances to support the claim that the children were not seized from Joseph. This argument is also disingenuous, given that Deardorff completed two separate "Taking Custody of a Child Without a Verbal or Written Court Order: Description of Circumstances" forms: one as to Elizabeth, *see* (Ex. QQ), and one as to Joseph, *see* (Ex. RR).

At the time the children were taken into custody by DCS on October 23, 2013, there was not a court order in place regarding their detention; therefore, their removal had to be justified by

probable cause or exigent circumstances. Plaintiffs contend that, while it may have been reasonable to seize the children from Elizabeth, the DCS employees had no probable cause to keep them from their father Joseph because there was no evidence that Joseph posed any threat to them. Again, there is no evidence before the Court of any allegations of abuse against Joseph or allegations that Joseph had threatened to harm the children. Plaintiffs argue that Defendants have not identified any evidence that a DCS employee could have relied upon to support a finding of probable cause on October 23, 2013, based on the children facing an immediate threat of harm from Joseph. Plaintiffs note that Joseph and has family had previously contacted DCS asking them to check on the children whom they believed had been showing signs of abuse while in Elizabeth's care, demonstrating their concern for the children's safety.

In reply, Defendants point to the September 24, 2013 Order of Protection issued one month earlier by the Porter Superior Court in favor Petitioner Elizabeth against Respondent Joseph, which ordered:

1.    The Respondent is hereby enjoined from threatening to commit or committing acts of domestic or family violence, stalking, or a sex offense against the Petitioner and the following designated family or household members, if any:

    [B.L.; O.L.; T.L.];

2.    The Respondent is prohibited from harassing, annoying, telephoning, contacting or directly or indirectly communicating with the Petitioner, except: PARENTING TIME ORDERED BY ANY COURT IN A DISSOLUTION OF MARRIAGE ACTION.

3.    N/A

4.    The Respondent is ordered to stay away from the residence, x school, and/or x place of employment

of the Petitioner. The Respondent is further ordered to stay away from the following place(s) that is/are frequented by the Petitioner and/or Petitioner's family or household members; _____.

5.   N/A

6.   N/A

7.   N/A

THIS EX PARTE ORDER FOR PROTECTION EXPIRES
ON THE 24TH DAY OF SEPTEMBER, 2015.

Date: 9/24/2013

(Ex. G). Without citation to law or any supporting evidence, Defendants argue that "[i]t is insincere to claim that Defendants Deardorff and Smith would not look at that order and believe there [was] justification to keep the children from Joseph." (ECF 50). The Court disagrees. Viewing the facts of record in the light most favorable to Plaintiffs, Deardorff and Smith had previous interaction with Elizabeth and the children and would have known that there were no allegations of violence or threat of violence by Joseph or any reason to suspect that Joseph would harm the children. In addition, Deardorff and Smith were Family Case Managers presumably with a working familiarity with the various orders issued by courts and the difference between an Order of Protection and a No Contact Order. The Order of Protection itself did not prevent Joseph from having contact with the children or from being with the children. Although there was significant evidence on October 24, 2013, that B.L. was being abused by someone, none of that evidence indicated that it was Joseph, and Defendants do not argue otherwise.

In the form titled "Taking Custody of a Child without a Verbal or Written Court Order: Description of Circumstances" that was completed as to Joseph, Deardorff selected two pre-printed

facts establishing probable cause: "the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education or supervision" and " the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian." (Ex. RR). In the next section requesting a brief description of the circumstances in which the child was found that warranted the selection of those two categories, Deardorff wrote: "B.L. presented at the hospital with severe injuries due to child abuse." *Id*. These facts, while applicable to the form completed as to Elizabeth, are not relevant to Joseph. In other words, the form completed as to Joseph does not explain why the children were in danger from Joseph or give a factual basis for keeping them from him.

And, nowhere in Deardorff's October 23, 2013 "Intake Officer's Report of Preliminary Inquiry and Investigation" ("Intake Officer's Report") is there any representation that Joseph was a danger to the children. *See* (Ex. SS). None of the five paragraphs of facts supporting probable cause mention Joseph. The Intake Officer's Report lists Elizabeth as the children's mother and married but separated and lists Joseph as the children's father and married but separated. For each child, the form lists "legal custody" with Elizabeth as "(Mother - Physical Custody)". Under the heading "Reasonable Efforts/Best Interests," Deardorff incorrectly states that "there is currently a *no contact order* in place between father and his family, regarding mother and all of the children." (Ex. SS - DCS000143) (emphasis added). And, in the subsequent "Recommendation and Reasoning," Deardorff recommended, "Due to a current *no contact order* between father and the children, visitation not be granted to father." *Id*. (emphasis added). Defendants do not make any

other legal or factual arguments that would have been a basis known to Deardorff at the time for not placing the children with Joseph on October 23, 2013.

The Court recognizes that Joseph himself testified at his deposition that he believed he was prevented from seeing the children based on the Order of Protection. However, when the facts available to the Court on this Motion for Summary Judgment are viewed in the light most favorable to Plaintiffs, based on the plain language of the Order of Protection and the lack of any evidence that Joseph was a threat to the children, a jury could find that a prudent case manager, using reasonable caution, would not have believed that the children faced an imminent threat of danger from Joseph.[3]

In their Motion for Summary Judgment, Defendants argue that they are entitled to qualified immunity on the removal of the children from Elizabeth; however, they do not assert qualified immunity based on the decision to remove the children from Joseph. Qualified immunity shields "government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Siliven*, 645 F.3d at 925 (citing *Pearson v. Callahan*, 555 U.S. 223, 230 (2009)). The Fourth Amendment right regarding the removal of children from their home and family was clearly established at the time of these events, and there is a genuine issue of material fact as to whether the

---

[3] In support of their Fourth Amendment argument, Plaintiffs also cite *Brokaw* for its correct statement of the law that, even if a court order directed the child's removal or if exigent circumstances or probable cause justified the removal, "the manner in which the defendants seized [the child] may still make his seizure unreasonable." (ECF 47, p. 11 (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1011-12 (7th Cir. 2000)). But this analysis in *Brokaw* concerned the physical circumstances of the removal itself. In *Brokaw*, the defendants were dressed in plain clothes, drove an unmarked car, entered the home in the evening without knocking or identifying themselves, and refused to identify themselves when asked to do so. *Id*. at 1012. They also "abruptly removed the screaming children from the home without explanation. In effect they acted like kidnappers rather than law enforcement officers." *Id*.

There are no allegations in this case that the manner in which the Lozano children were removed was a Fourth Amendment violation. Instead, Plaintiffs' factual analysis in this section of the brief is based on the alleged misrepresentations of fact by Deardorff to the Porter Juvenile Court in relation to the October 24, 2013 hearing and resulting Detention/Initial Hearing Order. These misrepresentations are considered in the context of the Fourteenth Amendment procedural due process claim, addressed below. *See Brokaw*, 235 F.3d at 1020.

conduct of Defendants Smith and Deardorff violated that clearly established right when they removed the children from Joseph. Accordingly, they are not entitled to qualified immunity on this claim. The Court further notes that Defendants' separate argument for quasi-judicial immunity is based on the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order and, thus, is not applicable to the initial October 23, 2013 detention without a court order.

The Court denies the Motion for Summary Judgment on the children's Fourth Amendment claims against Defendants Shawna M. Smith and Kathryn Deardorff based on the children's October 23, 2013 removal and placement in foster care rather than with Joseph. The Court grants summary judgment in favor of all other defendants on this claim.

b. Joseph's substantive due process rights - right to familial relations

A parent's interest in the care and custody of his children is subject to the protection of the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). And a forced separation of family members implicates this substantive due process right. *Brokaw*, 235 F.3d at 1018. Thus, Joseph's substantive due process claim is properly analyzed under the Fourteenth Amendment based on a fundamental right to familial relations. *Xiong*, 700 F.3d at 291; *Hernandez*, 657 F.3d at 480 ("[The child's parents] were not seized; their continued withholding claims are properly analyzed under substantive due process.").

> This right is not absolute, but must be balanced against the state's interest in protecting children from abuse. To achieve the proper balance, caseworkers must have some definite and articulable evidence giving rise to a reasonable suspicion of past or imminent danger of abuse before they may take a child into protective custody. A reasonable suspicion requires more than a hunch but less than probable cause.

*Hernandez*, 657 F.3d at 478 (internal quotation marks omitted) (quoting *Siliven*, 635 F.3d at 928).

Defendants only move for summary judgment on the continuing separation of Joseph and his children; Defendants do not address the initial removal of the children on October 23, 2013 without a court order. Joseph's substantive due process claim based on the children's initial removal "stand[s] or fall[s] with [the child's] Fourth Amendment claim premised on his removal." *Xiong*, 700 F.3d at 291 (quoting *Hernandez*, 657 F.3d at 478); *see also VanWinkle on behalf of MV v. Nichols*, No. 1:15-CV-1082, 2017 WL 4224767, at *19 (S.D. Ind. Sept. 22, 2017). As with the children's Fourth Amendment claims related to their initial detention, genuine issues of material fact exist as to whether a prudent case worker would have a reasonable suspicion that the children faced an immediate threat of abuse from Joseph; there is no evidence that they had a reasonable suspicion of past abuse from Joseph. Thus, the Court denies summary judgment on Joseph's substantive due process claim based on the initial detention by Smith and Deardorff.[4] For the same reasons set forth in the previous section, Smith and Deardorff are not entitled to qualified immunity on this claim.

As for Joseph's continuing separation from the children once they were detained, Defendants argue, without citation to law, that Plaintiffs are challenging a single seizure, not two separate seizures. However, this argument overlooks the court's recognition in *Hernandez* that the court in both *Brokaw* and *Siliven* addressed a claim based on an ongoing separation under substantive due process distinct from the analysis of the initial seizure under the Fourth Amendment. *See Hernandez*, 657 F.3d at 479 (citing *Brokaw*, 235 F.3d at 1018-19; *Siliven*, 635 F.3d at 928). Thus, Joseph's claim based on the ongoing separation is properly analyzed as a violation of substantive due process under the Fourteenth Amendment.

---

[4] Although the parties do not clarify against which defendants this claim is brought, based on the arguments in the Fourth Amendment context, it appears that Smith and Deardorff are the proper defendants.

Defendants also seek summary judgment on the continuing separation claim on the basis that FCM Nicole Markley was bound by the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order. Defendants assert that the only proper Defendants to this claim are FCM Nicole Markely and FCMS Dingman (who supervised and approved Markley's actions and reports) in their individual capacities, and Plaintiffs' response brief addresses this claim only as to Markely and Dingman. Markley was prohibited by the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order from authorizing visitation between Joseph and the children. (Ex. M - DCS000149). Thus, Markley had more than reasonable suspicion to continue to keep them apart. As quoted above, the October 24, 2013 Detention/Initial Hearing Order from the Porter Juvenile Court specifically stated: "The Court finds there is currently a protective order in place between father and the children, and that there is the potential for a No Contact Order between mother and the children, and *therefore does not authorize either mother or father visitation with the children at this time*." (Ex. M, p. 2- DCS 00015) (emphasis added). Then, on November 12, 2013, the Porter Juvenile Court issued a "Continued Initial Hearing Order," in which the court allowed Joseph to have supervised visits with the children but did not place the children with Joseph. (Ex. O - DCS000155-158).

Plaintiffs offer no response to this argument. Instead, Plaintiffs argue that there are issues of fact about whether Markley and Dingman had reasonable suspicion to keep Joseph and the children apart based on the earlier September 24, 2013 Porter Superior Court Order of Protection; but, unlike the initial detention, the Order of Protection is not the factual basis for the continuing separation. And, Plaintiffs offer no explanation as to why Markely and Dingman could have defied the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order or what they should have done differently in light of the Detention/Initial Hearing Order. In fact, Plaintiffs do not even

address Markely and Dingman's reliance on the October 24, 2013 Detention/Initial Hearing Order. Defendants argue that, on this basis, Markely and Dingman are entitled to qualified immunity. The Court agrees. Although the law regarding a substantive due process claim for the detention of a child was generally established by the time of the fall of 2013, the Court finds that the right was not clearly established based on the circumstances presented in this case. *See VanWinkle*, 2017 WL 4224767, at *20 (finding that the substantive due process claim as it related to the time period after the June 19, 2013 court order was obtained was not clearly established because a reasonable officer might not have known that the conduct at issue was unlawful). The Court finds that Markley and Dingman are entitled to qualified immunity on Joseph's substantive due process claims based on his continuing separation from his children because Plaintiffs have not identified any cases (within or outside of the Seventh Circuit Court of Appeals) discussing the implications of a court's order that the children be detained and whether such an order protects a family case manager like Markley and a supervisor like Dingman from liability under § 1983. *Id*.[5]

To the extent that Plaintiffs are arguing that Markely and/or Dingman should have done something different after the Porter Juvenile Court Detention/Initial Hearing Order was entered, Plaintiffs do not identify what should have been done differently. In contrast, Defendants argue that, based on the circumstances at that point, Markely and Dingman had reasonable suspicion that supported each step they took to get Joseph reunited with his children. For example, Joseph was living at his parents at the time he sought to be reunited with his children, the parents did not initially pass their background checks, Markely requested a wavier for the parents on November 25, 2013,

---

[5] Because Defendants Markely and Dingman are entitled to qualified immunity and because this claim does not survive against any other defendants, it is unnecessary for the Court to consider Defendants' assertion of quasi-judicial immunity as to this claim.

Dingman approved the waiver, and on December 5, 2013, the DCS attorney filed for a change in placement to have the children placed with Joseph.

Accordingly, the Court grants summary judgment in favor of Defendants Markely and Dingman on Joseph's Fourteenth Amendment substantive due process claims based on the continuing separation from his children and grants summary judgment in favor of all the remaining defendants on this claim as well.[6]

    c.        Children's substantive due process rights

A child cannot maintain a substantive due process claim based on his or her initial removal because the Fourth Amendment addresses that seizure. *Hernandez*, 657 F.3d at 474 ("Substantive due process may not be called upon when a specific constitutional provision (here, the Fourth Amendment) protects the right allegedly infringed upon." (quoting *Doe v. Heck*, 327 F.3d 492, 518 n.23 (7th Cir. 2003))); *see also Brokaw*, 235 F.3d at 1017-18; *VanWinkle*, 2017 WL 4224767, at *18. In other words, "if a plaintiff's sole purpose in bringing a familial relations claim is to recover damages for a physical seizure, then that claim is more appropriately analyzed under the Fourth Amendment. On the other hand, if, . . . a familial relations claim specifically alleges that the government's physical seizure coincided with other conduct amounting to an interference with the parent-child relationship, the plaintiff may also maintain a substantive due process claim." *Hernandez*, 657 F.3d at 479-80 (internal quotation marks omitted) (quoting *Heck*, 327 F.3d at 518 n. 23).

_____

[6] In the context of the substantive due process claim, Plaintiffs also argue that Deardoff made misrepresentations that led to the entry of the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order. However, these allegations are properly analyzed under the procedural due process claim below.

However, the children's allegations that their right to familial relations was violated by the ongoing separation from their father in the weeks following the October 24, 2013 Detention/Initial Hearing Order is properly analyzed as a Fourteenth Amendment substantive due process claim. *See Brokaw*, 235 F.3d at 1018-19 ("Equally fundamental is the substantive due process right of a child to be raised and nurtured by his parents." (citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)); *but see Xiong*, 700 F.3d 282 (analyzing the children's ongoing detention claim between the time of the initial seizure and the court hearing two days later under the Fourth Amendment framework (citing *Herandez*, 657 F.3d at 480)). Like their Fourth Amendment rights, the children's constitutional right to family integrity is not absolute and must be balanced against the state's interest in protecting children from abuse. *Brokaw*, 235 F.3d at 1019. "In balancing these competing interests, courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* (citing *Croft*, 103 F.3d at 1126).

Nevertheless, the children's substantive due process claim based on their continued separation from Joseph fails for the same reason that Joseph's claim fails—Defendants Markley and Dingman are entitled to qualified immunity because they were acting pursuant to the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order and because Plaintiffs have not identified any steps Markley and Dingman should have taken under the circumstances in their efforts to ultimately reunite Joseph and his children on December 5, 2013. Therefore, the Court grants summary judgment in favor of all Defendants on the children's substantive due process claims.

d.      Procedural due process rights - Joseph and the children

The Fourteenth Amendment Due Process Clause provides: "No State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Under 42 U.S.C. § 1983, an individual may bring a claim against a person acting under the color of state law for a violation of this constitutional right. *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017). A procedural due process claim requires a "two-part analysis: First, we determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then we assess what process was due." *Brokaw*, 235 F.3d at 1020 (citing *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996)).

The protected liberty interest Plaintiffs were deprived of is that of familial relations. *See Brokaw*, 235 F.3d at 1020. As for the process that was due, the United States Supreme Court held that parental rights cannot be denied without an "opportunity for them to be heard at a meaningful time and in a meaningful manner." *Brokaw*, 235 F.3d at 1020 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The amount of process due varies with the particular situation. *Id*. (citing *Mathews*, 424 U.S. at 334). "However, no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020 (citing *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999)).

In the Motion for Summary Judgment, Defendants argue that the October 24, 2013 post-deprivation hearing the day after the children's detention was more than adequate to satisfy the requirements of procedural due process. However, Plaintiffs argue in several places in their response brief that there is a genuine issue of material fact as to whether FCM Deardorff misrepresented facts

to the Porter Juvenile Court and the extent to which the Porter Juvenile Court's October 24, 2013 Detention/Initial Hearing Order denying Joseph custody and/or visitation was based on the misrepresented facts.[7]

In support, Plaintiffs first point to the Verified Petition Alleging Children in Need of Services, filed by DCS on October 24, 2013, which provides: "The father of the children *does not have legal custody* and the Porter Superior Court issued an Order of Protection on September 26, 2013, which *prohibits him from having contact with the children due to issues of domestic violence*. The Order is in effect until September 24, 2015." (Ex. L - DCS000146, ¶ 6(5)). However, this Petition was completed by DCS attorney Julie Carter, who is not a defendant in this case. It is unclear where Carter obtained this information; although, it is possible that she obtained it from Deardorff's October 23, 2013 Intake Officer's Report. (Ex. SS). Plaintiffs assert that the earlier-dated Intake Officer's Report "repeats the falsehood that Joseph was under a no contact order and that he did not have legal custody." (ECF 47, p. 12). As noted above, the Intake Officer's Report lists only Elizabeth as having "legal custody" and also three times states that there a "no contact order in place" between Joseph and the children. (Ex. SS, p. 7 - DCS000143).

Plaintiffs argue that Joseph had legal custody of his children, that he and Elizabeth were married at the time, and that no court had entered an order taking away Joseph's legitimate legal custody of his children. Thus, the statement in the Verified Petition that "the father does not have legal custody" is a material misrepresentation if it influenced the court's detention decision.

---

[7] In their reply brief, Defendants address these misrepresentations by Deardorff in the context of Plaintiffs' Fourth Amendment claims. However, these claims are properly addressed in the context of the Fourteenth Amendment procedural due process claim.

Plaintiffs also argue that the description of the Porter Superior Court's September 24, 2013 Order of Protection as a "no contact order" in Deardorff's Intake Officer's Report and in Carter's Verified Petition were material misrepresentations as to the nature of the September 24, 2013 Order of Protection. Plaintiffs are correct that there is a difference between a "no contact order" issued by the juvenile court based on a petition filed under Indiana Code § 31-34-25-1 and an ex parte "order of protection" issued by a superior court pursuant to Indiana Code § 34-26-5-9. (ECF 47, pp. 12-13). Although attorney Carter's Verified Petition properly named the order as an "Order of Protection," it incorrectly represented that the order prevented Joseph from having contact with his children and that the prohibition was because of issues of domestic violence. The September 26, 2013 Order of Protection enjoined Joseph "from threatening to commit or committing acts of domestic or family violence, stalking, or a sex offense against the Petitioner and the following family or household member, if any: O.L., B.L., T.L." (Ex. G). It further states: "Respondent is prohibited from harassing, annoying, telephoning, contacting or directly or indirectly communicating with the Petitioner, except: parenting time ordered by any court in dissolution of marriage action." *Id*. Plaintiffs reason that, although there was no dissolution matter pending, the fact that the Porter Superior Court contemplated a parenting time order evidences the intention of the Porter Superior Court that Joseph be permitted to continue parenting his children.

Defendants are correct that the Porter Juvenile Court's October 24, 2013 Order, issued the day after the children were detained, did not make a finding that Joseph did not have custody or that there was a "No Contact Order" against Joseph, as the order provided: "The Court finds there is currently a protective order in place between father and the children, and that there is the potential for a No Contact Order between mother and the children, and therefore does not authorize either

mother or father visitation with the children at this time." (Ex. M, p. 2- DCS 00015). However, this decision was based on the representations made in the documents filed with the Porter Juvenile Court and made in open court. The fact that the order did not explicitly state that Joseph did not have custody does not mean that the court did consider the representations in deciding not to allow him visitation.

Also, at the hearing in open court before the Porter Juvenile Court on October 24, 2013, Elizabeth requested dismissal of the Porter Superior Court's September 24, 2013 Order of Protection. (ECF 48-1, p. 10 (Pl. Ex. 2)).[8] And, the Porter Superior Court Order dated October 24, 2013 dismissing its Order of Protection is based on that oral motion by Elizabeth in the Porter Juvenile Court: "Petitioner has requested dismissal under oath and on the record in Porter Juvenile Court in a CHINS hearing under cause numbers 64C01-1310-JC-1027, 1028, 1029." *Id.* There is no record before this Court of what representations were made verbally to the Porter Juvenile Court that date. However, the Assessment of Alleged Child Abuse or Neglect completed by Deardorff provides that DCS requested at the Porter Juvenile Court hearing on October 24, 2013, that the children remain in the foster home "due to a current no contact order between father and the children, visitation not be granted to father" and also that a "no contact order was dropped that mom took out against dad and all paternal relatives on this day per mom's request." (ECF 39-24, p. 15 (Ex. X - DCS 000030)). Although it appears that the Porter Juvenile Court's Detention/Initial Hearing Order was issued before the Porter Superior Court's order dismissing the September 24, 2013 Order of

---

[8] In their reply brief, Defendants assert that the "juvenile court was not presented with *evidence* that the order was dropped until four days after the hearing." (ECF 50, p. 7). While the Porter Juvenile Court may not have received the Porter Superior Court's order dismissing the Order of Protection until a later date, the evidence of record shows that Elizabeth made the request to have that Order of Protection dismissed in open court before the *Porter Juvenile Court* and in front of the DCS representatives present.

Protection, it appears that DCS requested at the juvenile court hearing that the children be kept from Joseph based on the Order of Protection even though at the very same hearing Elizabeth requested dismissal of the same Order of Protection.

This Court recognizes that the Porter Juvenile Court was not in a position to dismiss the Porter Superior Court's Order of Protection; nevertheless, the nature of the representations by Deardorff to the juvenile court to keep the children in foster care are concerning. The Court finds that, based on this evidence, there is a genuine issue of fact as to whether Deardorff made material misrepresentations to the juvenile court that led the court to keep the children in foster care rather than placing them with Joseph. The Court denies summary judgment on the Fourteenth Amendment procedural due process claim against Defendant Kathryn Deardorff but grants summary judgment on this claim as to all other Defendants.

      e.      Right to petition the government

The First Amendment provides a right to petition the government for redress of grievances. U.S. Const. amend. 1. "'The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'" *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To make out a prima facie case of First Amendment retaliation, Plaintiffs must show that (1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in DCS's decision. *Id.* Once a plaintiff makes out a prima facie case, the burden shifts to the defendant to show that the harm would have occurred without the First Amendment

activity. *Id.* at 251-52 (citing *Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir. 2004); *Brown v. Cnty. of Cook*, 661 F.3d 333, 335 (7th Cir. 2011)).

In their Complaint, Plaintiffs allege a violation of their First Amendment right to petition the government. In their response brief, Plaintiffs clarify that DCS retaliated against the Lozanos for making repeated reports to DCS by keeping the children from Joseph. Defendants seek summary judgment on this claim on the basis that they have shown that the children would have not have been placed with Joseph even if the Lozanos had not made complaints about Elizabeth to DCS.

As for their prima facie case, Plaintiffs have established the first two prongs. Joseph and his family engaged in protected speech by filing a complaint with DCS about Elizabeth, and Joseph's children were not placed with him when they were removed from Elizabeth's care on October 23, 2013.

As for causation, Plaintiffs cite Joseph's testimony that, on October 3, 2013, when Joseph met with FCM Smith at the DCS offices, Smith told Joseph to have his friends and family stop calling about child abuse. (Joseph Dep. 88:5-13; 88:21-89:4). Although Smith denies making this statement, for purposes of summary judgment, the Court views this fact in the light most favorable to Plaintiffs and considers Joseph's testimony. Nevertheless, the Court finds that this statement by Smith is insufficient to establish causation. First, the statement was allegedly made on October 3, 2013, and DCS continued to investigate the complaints made against Elizabeth on October 10, 2013, and October 15, 2013, ultimately removing the children from Elizabeth and taking them into custody on October 23, 2013. Second, the statement was made by Smith; FCM Deardorff took the children into custody on October 23, 2013, and FCM Markley was initially responsible for placing the children. There is no evidence that Smith communicated a similar statement or sentiment to

Deardorff or Markley. Thus, Plaintiffs have not presented evidence that the reports to DCS were a motivating factor in the decision not to place the children with Joseph on October 23, 2013.

Moreover, even if the statement by Smith could be considered as a motivation for Deardorff and Markley's actions, Defendants have shown that they would have reached the same result even without the protected speech, and Plaintiffs offer no argument in opposition, waiving any such argument. Deardorff's recommendation that the children be taken into custody was based on the September 24, 2013 Order of Protection, which was issued by the Porter Superior Court prior to the October 3, 2013 statement by Smith. Although Plaintiffs argue in relation to the Fourth and Fourteenth Amendment claims that Deardorff should not have relied on the September 24, 2013 Order of Protection to detain the children, Plaintiffs neither argue nor offer evidence that Deardorff did not actually rely on the September 24, 2013 Order of Protection or that her reliance was a pretext for retaliation. As discussed above, once the Porter Juvenile Court issued its order on October 24, 2013, Markely and Dingman took reasonable steps to reunite the children and Joseph by December 5, 2013, steps which Plaintiff have not shown were unreasonable. No reasonable jury could conclude that Defendants retaliated against Plaintiffs for the exercise of First Amendment rights, and the Court grants summary judgment in favor of all Defendants on this claim.

    f.    Equal protection

In their Complaint, Plaintiffs allege a deprivation of equal protection rights by Defendants "failing to comply with applicable state and federal statutes and regulations designed to balance the need to protect neglected and abused children against the constitutional rights of parents to raise their children and the children's rights to be with their parents." (ECF 4, ¶ 16(d)). In the Motion for Summary Judgment, Defendants argue that Plaintiffs do not identify any type of protected class. *See*

*Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015) ("To establish liability for an equal protection violation, a plaintiff must establish that the defendant acted with a discriminatory purpose and discriminated against him because of his membership in an identifiable group."). Plaintiffs offer no response in support of this claim, abandoning it. Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' Equal Protection claim.

 g. Due process claims based on statutes and regulations

 In the Complaint, Plaintiffs allege a deprivation of "due process rights by failing to comply with applicable state and federal statutes and regulations designed to balance the need to protect neglected and abused children against the constitutional rights of parents to raise their children and the children's rights to be with their parents." (ECF 4, ¶ 16(d)). First, a violation of a state statute does not give rise to a claim under § 1983. *See Armstrong v. Daily*, 786 F.3d 529, 542 (7th Cir. 2014). Second, Plaintiffs do not offer any support in their Complaint for their allegations that Defendants violated unnamed federal statutes and regulations or the statutes listed in the Complaint—41 U.S.C. § 5106, 42 U.S.C. § 671(a)(15), 45 C.F.R. § 1356.21, 42 U.S.C. § 675(1)(A), and 42 U.S.C. § 675(5). And, Plaintiffs offer no response in support of these claims, waiving a response and abandoning the claims. The Court grants summary judgment in favor of Defendants on Plaintiffs' Due Process claims related to statutes or regulations.

## B. State Law Claims

 Defendants move for summary judgment on all of Plaintiffs' state law claims. First, Defendants argue that the individually-named Defendants are immune under the Indiana Tort Claims Act for any and all actions taken or inaction in relation to the events underlying this lawsuit. Under the Indiana Tort Claims Act, there is no remedy against an individual employee so long as the

employee was acting within the scope of employment. *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) (citing Ind. Code § 34-13-3-5(b); *Julian v. Hanna*, 732 F.3d 842, 848-49 (7th Cir. 2013)). In their response brief, Plaintiffs agree. The Court grants summary judgment in favor of the individual defendants on all of Plaintiffs' state law claims. Second, as for Defendants State of Indiana and Indiana Department of Child Services, Defendants assert several bases for finding that they are not liable for the state law claims. Plaintiffs offer no substantive response in support of the claims, and, in fact, concede all of Defendants' arguments on the state law claims. Therefore, the Court grants summary judgment in favor of Defendants State of Indiana and DCS on Plaintiffs' state law claims as well.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part and DENIES in part** the Motion for Summary Judgment [DE 38]:

The Court **GRANTS** summary judgment in favor of Defendants Rachel Gibson, Terrance Ciboch, Nathan Johnson, James Wide, and Louella F. Richey on all claims (federal and state law claims).

The Court **GRANTS** summary judgment in favor of all Defendants on all of Plaintiffs' state law claims.

The Court **GRANTS** summary judgment in favor of Defendants Indiana Department of Child Services and State of Indiana on all § 1983 claims.

The Court **GRANTS** summary judgment in favor of all Defendants on the § 1983 Fourteenth Amendment equal protection claims and § 1983 Fourteenth Amendment due process claims based on federal or state statutes.

The Court **DENIES** summary judgment on the § 1983 Fourth Amendment claim against Defendants Shawna M. Smith and Kathryn Deardorff based on the children's October 23, 2013 initial removal and placement in foster care rather than with Joseph, but **GRANTS** summary judgment on the Fourth Amendment claims against all other Defendants.

The Court **DENIES** summary judgment on Joseph's § 1983 Fourteenth Amendment substantive due process claim against Defendants Shawna M. Smith and Kathryn Deardorff based on the children's October 23, 2013 initial removal, but **GRANTS** summary judgment in favor of all Defendants on Joseph's § 1983 Fourteenth Amendment substantive due process claims based on the ongoing separation from his children.

The Court **GRANTS** summary judgment in favor of all Defendants on the children's § 1983 Fourteenth Amendment substantive due process claims.

The Court **DENIES** summary judgment on the § 1983 Fourteenth Amendment Procedural Due Process claim against Defendant Kathryn Deardorff, but **GRANTS** summary judgment in favor of all other Defendants on this claim.

Therefore, the case will proceed to trial on (1) Plaintiffs B.L., O.L, and T.L.'s § 1983 Fourth Amendment claim against Defendants Shawna M. Smith and Kathryn Deardorff based on their initial removal on October 23, 2013; (2) Plaintiff Joseph Lozano's § 1983 Fourteenth Amendment substantive due process claim based on the children's initial removal on October 23, 2013; and (3) Plaintiffs' § 1983 Fourteenth Amendment procedural due process claim against Kathryn Deardorff based on material misrepresentations made to the Porter Juvenile Court in relation to the October

24, 2013 detention/initial hearing that ultimately led to the October 24, 2013 Detention/Initial Hearing Order.

SO ORDERED this 5th day of December, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT